1155, Fleur Tehrani, Ph.D. against Polar Electro and others. Mr. Rookridge. May it please the Court. The District Court had a fundamental claim construction error that pervaded its entire claim construction and summary judgment analysis. In particular, the Court's construction of patient to exclude normal, healthy individuals is wrong for at least four reasons. Ms. Atkins. How would you construe it? Mr. Rookridge. The… Ms. Atkins. Anyone with a heartbeat? Mr. Rookridge. No. Someone who is subject to a particular test. In this case, the MRR test that Dr. Tehrani's patent claims are directed to. Mr. Sperling. Just, by the way, if we find against you on the cardiac function, is the case over?  That's correct. The case is over. Mr. Sperling. So… Ms. Atkins. Ms. Atkins. Let's turn to that. That seems as if it's… Mr. Rookridge. The patient definition infected the cardiac function issue because the District Court erred in relying on the distinction between patient and normal, healthy individual to construe cardiac function, and that construction is completely inconsistent with the simplified exercise embodiment that Dr. Tehrani disclosed in her patent. But, second, and more importantly, what this… Mr. Sperling. What's the fundamental flaw in the cardiac function as either… Mr. Rookridge. Two fundamental flaws, Your Honor. Two… Mr. Sperling. Heart rate and stroke volume or cardiac output, right? Mr. Rookridge. Yeah. Two fundamental flaws in that. First, that it's the… The courts… That courts basically conflated the term data indicative of a cardiac function to mean cardiac output. The… There's two fundamental errors with that. First, it's inconsistent with the simplified exercise embodiment, but, second, and more importantly… But there's four times in the spec where it says just about that exact thing. The abstract passage on which the District Court relied is ambiguous. It used the word may. Later, at page 876, column 12, lines 20 through 21, it says at least. When the patent, when Dr. Tarani and the patent wanted to define a term, she very clearly said is, for example, at A76, column 1, lines 57 through 58. She didn't say may or at least, and the defendant's experts agreed that there was no express definition here. But… Let me ask… You know what? How would you define cardiac function? The definition that we provided for cardiac function was that it can refer to heart rate alone, that cardiac function, we said, is any physiological activity of the heart, and Judge Carter said… Where in the spec, where do you, in the spec, find any support for that? We've got four places in the spec where the inventor defines cardiac function as either heart rate and stroke volume or cardiac output. We disagree. Column 2, column 4, column 1, column 12. We disagree. She didn't provide a definition for cardiac function in those places. What she was doing was giving examples, just like she gave the example of data indicating the heart rate. Well, but at least there's four things there that the district court could grab and note as important. Is there anything you can show us in the spec that says it's just heart beat? Yes. The court's construction of cardiac function was inconsistent with the portions of the either stroke volume or a representative stroke volume value. For example, page A78, column 5, lines 30 through 48. There is no dispute, Your Honor. Is it, is there a column? Yes, column 5. Column 5. Page A78. Well, just give me the lines on the column. I've got the patent here. Column 5, lines 30 through 48. 30. There's no dispute that in that passage that the specification explains that you can either store a constant stroke volume in the software, that is the second means, and if a constant is used for the stroke volume, the heart rate alone in the first means becomes data indicative of a cardiac function. The heart rate, as Dr. Tarani explained, the heart rate at rest can be used to derive the stroke volume. Do any of the accused devices store stroke volume? They don't. They do the equivalent of storing stroke volume. They put in a constant that's used. And so they don't store, they don't measure the patient's stroke volume and store it. But this is talking about the patient's stroke volume. Okay. Now understand that if you, the district court erred in footnote 7 by saying that the stroke volume had to be measured from the patient. There is no dispute that the specification teaches that stroke volume can be read or stored if not constantly monitored. That's page A80, column 10, lines 36 through 38. And this is an important issue, Your Honor. At page A78, column 5, lines 43 through 48. This is where the district court. But that, I just went to your column 10 place, and that is the patient's stroke volume that's entered, not just a constant. Well, take a look. It says if you look at that column 10, line 32, the value of the patient's stroke volume is entered. But then you can go down and it says the stroke volume may be read from one of the input channels. But then take a look at column 5, particularly starting at line 43. That's where we just were. Alternatively, if it is not desired to monitor stroke volume continuously, a representative value, paren, e.g., obtained from the patient prior to operation of the system and paren, may be stored in software. Still the patient's stroke volume, isn't it? This is what the district court made the error. The district court made the error by converting that e.g., for example, to an I.E. That is, or namely, that was, getting it from the patient was an example of a representative stroke volume. Stroke volume can be determined in any number of ways, and the prior art knew how to do that. This disclosure says all you need to do is plug in a representative stroke volume value. That it gave an example. But it has to be the patient's stroke volume. You're more athletic than me. You probably pump more per beat than I do. I disagree with that as well, Your Honor. But the point is that... But what the patent is saying that you can use for the patient a representative stroke value. And there are ways to determine that. In fact, Dr. Tarani explained that you don't need to measure it from the patient. And this clearly explains that measuring it from the patient beforehand is just an example. And the district court improperly converted that example as to being a requirement. Any representative value should suffice. Isn't even stroke volume dependent on my posture? Stroke volume can be dependent on posture. That's true. So we're not talking about a constant or a computation. If we're talking about the patient's cardiac output, we're talking about our posture and everything else that feeds into our stroke volumes, right? That's not necessarily correct. As the simplified embodiment showed, that stroke volume doesn't necessarily vary so much that you need it. In fact... I'm having trouble because you have to do an awful lot of explaining. And the patent has four times said, quite simply, that the data we're looking for is heart rate and stroke volume or cardiac output. Just exactly what the district court found. Very directly it says that four times. And you and I are arguing about whether it's the patient's stroke volume or not in some constant, which is hard to find in the rest of the patent if it's there. The patent's description of preferred embodiments talking about expressly measuring the patient's stroke volume or measuring it before our preferred embodiments. There is an express recitation in the patent of using what the patent calls a representative value. And you can get a representative value, for example, by measuring heart rate at rest. Let me ask you this question. Could any of these accused devices enter some kind of a value and store it for the computation that you have to make in this patent? Yes, just merely by measuring the resting heart rate, if you use the equations eight and nine, you can derive the stroke volume. So there's, once again... Do you remember that apparatus and method requires that it all be done by this single algorithm? Correct. And that doesn't mean that someone's doing a calculation outside of the algorithm to find the value. Correct. The algorithm... So you have to show me that it's all done by the machine. Correct. And the steps in the algorithm that do that for the simplified exercise embodiment are equations eight and nine. Okay? Merely by putting in the resting heart rate, you don't need the stroke volume. And that's consistent with both discussions of the simplified exercise embodiment. Now, and that's where we believe that the district court erred by converting the phrase representative value into one that was necessarily taken from the subject of these tests. That's the column five part? That's the column five part, yes, Your Honor. So I gather, Mr. Rookwood, you're not concerned about whether, based on your interpretation of the claims, there would be additional validity issues that haven't been confronted thus far. Absolutely not, Your Honor, because the validity is not at issue in this claim construction. We're confident we can deal with the validity when we get back down before the district court. And, Your Honor, I might follow up further on your question about the exact mechanism. The district court erred by interpreting, inferentially, that second means limitation to require all of the equations one through nine. The patent clearly points out, and Dr. Tarani pointed out, that all of the equations are used for the more complex embodiment, that under the simplified exercise embodiment, only equations eight and nine are needed. Thus, the district court's implied construction of the second means is wrong as well and should be reversed. I see I'm... Can I just ask to just clarify one thing now? Even if I agree with you on patient, if I disagree with you on cardiac function, the case is over. Is that right? That's correct, Your Honor. So, okay. Okay. Thank you, Mr. Rookwood. Mr. Moran. Thank you, Your Honor. On behalf of Polar, I'd like to make a few points. We believe that the district court correctly interpreted the issue before the court, and that was the scope of the means plus function language, and particularly the first means, the means for providing data indicative of the cardiac function. Why don't you respond to the language cited by the other side from the specification, namely column five, and the argument they were making? Alternatively, it is not desired to monitor stroke volume. You can enter a representative value. That still requires stroke volume, which goes to the district court's interpretation of cardiac function as being cardiac output. Cardiac output is either measured by a special machine or calculated by heart rate times stroke volume. The source of the stroke volume, as was discussed earlier, can be either input. The district court found that it had to come from some place. So you don't think that there's anything there that's inconsistent with the district court's claim construction? Not at all. The claim construction before the court was, what is the scope of the first means? It went to the district. It went to the specification to say, first of all, what kind of data are we talking about here? Cardiac function data. Cardiac function data of whom? The claim says specifically a patient. The claim could have just said, means providing data indicative of a cardiac function. But how do you get around the EG, which suggests that it's just one, for example, you can obtain it from the patient? You still have to obtain it. But it says, just for example, you can obtain it from the patient, meaning perhaps what Mr. Rookledge was trying to tell us, you could enter a constant. That does not change the definition of cardiac function as being heart rate times stroke volume, or cardiac function being the cardiac output measured by a special machine. The source of the data... But if you've entered a constant that handles stroke volume, then the only other part you need is the heart rate. But you still need stroke volume. That's still cardiac output. Cardiac output has, if you're calculating it, two parameters, heart rate and stroke volume. You can put it in. It's still there. The only thing else you have to measure as a variable is heart rate. But it's still data being used, and it's not inconsistent with the specification of all those places Your Honor noted earlier for the district court's claim interpretation of cardiac function. It's clearly recited here. This EG is a source. It doesn't erase that information from the algorithm or the definition of cardiac function here. Well, if I'm understanding it correctly, they discount the other language in the specification, including the abstract, because it says it may be this or that, but that wouldn't preclude something else as well. No, the district court addressed that, and it's addressed in our brief. The may be is natural language that says it may be either or. If it was only the abstract, maybe we could be debating it, but it's consistent with the other places that Judge Rader noted earlier, right, the summary of the invention, and that's directed to that information. And throughout the specification, as noted in our brief, there's no ifs, ands, or buts here. The inventor clearly said the invention uses this data. It wasn't preferred embodiments use it. It says the invention uses this data. So it's not isolated. We had an isolated case. Perhaps we had a different argument, but here there is an abundance of intrinsic evidence that shows this. But is the district court, by doing this, written out of the scope of the patent one of the claimed embodiments, the simpler embodiment as it describes it here? No, Your Honor, not at all. The one that it talks about is an exercise monitoring system for a normal, healthy subject. Let me be clear. No, the district court did not write that out. The patentee did. The patentee chose to put claim language in there saying cardiac function of a patient. The language is there. If it wasn't there, we have a different case. But it is there, and no, the district court didn't write it out. The district court did what it was supposed to, and that is to look to the specification to say what is the structure to perform this function? If the means plus function had said, why can't a patient be a healthy person? I go to my doctor all the time. I'm rather healthy. He calls me his patient. Our position is that we don't really need to know what the definition of patient is in this means plus function analysis, as we argued in our brief. The patient simply identifies what structure, as an index or pointer in the specification, what structure is associated with this? The person whose heartbeat you're taking, right? Whether they're healthy or not. Whatever the specification teaches for a patient, and it identifies patients in some over 70 terms, items. It's not simply where they use it in column 1 and against in column 14. Yeah, but the gravity of your argument is that it excludes, that this patent shouldn't, the claims do not cover what it refers to as a normal, healthy individual. I think that's what Judge Rader is asking. That's right. Why should they be excluded? Because they chose the claim language to say, they said, we want a means plus function for providing data of a particular individual, a patient. And why is that word, patient, defined to exclude a healthy person, when one of the embodiments of the patent is specifically for healthy people? Right. It doesn't say for patients. It says for normal, healthy individuals or subjects. Wouldn't we look at the embodiments and assume that they are covering exactly what they say they're covering, and one of the embodiments is for healthy people? If it said no, because that's not the claim language, Your Honor. But they use claim language that I think covers healthy people. I'm a patient. In the specification. You're trying to tell us patient's a narrow term. I see it as a very broad, generic term. And I don't see anywhere here that the patent has defined patient to exclude a normal person. In fact, I think it's exactly the other way around. It has included within its claimed invention an embodiment that covers normal, healthy people. So obviously a patient is a normal, healthy person too. No, not in the context of the patent. Can you clearly see it, for example, in the column 5 area? I'm looking right at it, probably. You're talking lines 3 through 8. Yes, Your Honor. It says if system 10 is employed as an exercise monitoring system for a normal, healthy subject. Okay, what's system 10? That's the claim invention, right? System 10 is the one that's been described for the patient in the specification. For the patient. So, obviously, they mean by patient an exercise monitoring system for a normal, healthy subject, right? As distinguished from the one for the patient that they just got finished describing. So on your theory, if you're using this apparatus, you wouldn't know whether it was infringing unless the person who's being evaluated on this apparatus turns out to be sick, not healthy. If it's infringing by your apparatus, does your apparatus have the structure encompassed by the means that's been interpreted by the district court? That's where the definition comes into play, is in identifying the scope of the structure. I believe I have my time for my expo counsel. It's interesting. Well, but I asked Mr. Rookledge very carefully, do I really have to deal with patient? And I kind of got the impression, no, if cardiac function is one way, that's the whole case. I'm now convinced otherwise, that I really have to determine patient because that defines the scope of the means function you are pointing us to. And if perhaps we get into the normal, healthy patient, then we're dealing with the column five representative value that Mr. Rookledge is talking about, and maybe there are two embodiments here. There are two embodiments. We don't disagree with that, Your Honor. We say that the Chattentee chose certain language that says means for providing cardiac function of a patient. And throughout, basically throughout the specification, they talk about structures for a patient, and then as you noted, an alternative simplified for somebody else. And I believe I need to, my time, a lot of time. Okay, you and Mr. Quo have divided the argument on the issues as well? Not the issues, Your Honor, but we have divided the time. Okay, proceed. Good morning, Your Honors. So the definition of patient's part and parcel with this whole thing, huh? It is part of the analysis as. I have to buy that as well before I can sustain your argument. I don't believe that to be true. With respect to cardiac function, there's no difference within the patent as to what the cardiac function is, regardless if it's of a patient or of a healthy or normal individual, whatever that might be. The cardiac function is defined within the abstract as well as within the field of the invention. Well, don't we have to have highly persuasive evidence before we would exclude a claimed embodiment from the scope of an invention? You do, and I think the specification provides this highly persuasive evidence. The specification says, as you pointed out, within the abstract, it defines cardiac function as either stroke volume and heart rate or cardiac output. The virtually identical language is found in the field of the invention, where in its case- We've been over those. How do you respond to the argument that stroke volume can be derived from a resting heart rate? Not according to the patent. According to the patent, and I assume you're referring to column five, that one section. Yes. Within that section, it states specifically that if you don't want to monitor while the apparatus is being used, you can measure it from the patient at another time. And you would ask the question as to whether or not, does it have to be before? It could be after, I suppose. Regardless of when the measurement of the patient's stroke volume takes place, the measurement still takes place. And there's nothing disclosed within the patent itself that says, we can use a representative value that's totally divorced from the particular user's physiology. And as your honor correctly pointed out, each person is different. I'm not going to assume who's in better shape, you or me. But the fact of the matter is that the apparatus claimed here is very specific to an apparatus for a patient or a particular user. But the language is EG, obtained from the patient. That is true. For example, obtained from the patient, suggesting maybe there's an alternative way, maybe entering a constant, as Mr. Rookledge suggested. While that might be a possibility, this is a means plus function claim. It is not just a regular claim. This is subject to 112 paragraph 6, wherein you are limited to what's disclosed within the specification and its equivalence. Now, the question of whether or not a representative value is the equivalent of a person's actual value, there's ample testimony. I don't think it was actually made a part of the record that each person's stroke volume is going to vary significantly. A representative value is not going to give you, it's not one-stop shopping for everybody that might use this device. You're not going to get an accurate number, according to this invention, unless you measure that individual's stroke volume. Do the Accused devices store stroke volume data? Any more questions? Thank you. Okay. Thank you, Mr. Rookledge. Mr. Rookledge. The Accused devices use resting heart rate. And as Dr. Tarani explained, resting heart rate in equations, using equations 8 and 9, which the only equations required by the simplified embodiment, give you an estimation of stroke volume, and therefore the stroke volume is not needed. And that's what's perfectly consistent with her simplified exercise embodiment. So that's the key here, is that the patient or the subject or the individual, their resting heart rate is being used to identify a representative value of their stroke volume for use in those equations. Also, let me turn briefly to this. But equation 8 is specific to metabolic rate, is it not? I'm sorry? Equation 8 is specific to the metabolic rate ratio. Yes, and equations 8 and 9 are used to determine the metabolic rate ratio in the simplified embodiment. That's because the patent discloses that the particular ones of the earlier equations will just go to zero when you're using the simplified exercise embodiment, and the other equations are used to support those particular equations to go to zero. So you have zeros all the way down until you get to equations 8 and 9, which are used by the simplified embodiment. Now, Mr. Moran also talked about the patient aspect, but as Judge Rader pointed out, what the district court did was adopt a definition of patient that's completely contrary to the normal use of patient when you go in for a physical exam or the like. What's even more important is that none of the different dictionary definitions that were identified by the parties support a definition of patient that would exclude normal, healthy individuals. So there's really two presumptions that operate against the district court's presumption, both that he wasn't using the normal intended term and that he was excluding the preferred embodiment. I see I've run out of time. Thank you, Mr. Rickledge, and thank you, Mr. Moran.